UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET BATES, as Personal
Representative for the
ESTATE OF JOSHUA ALDRICH,                    Case No.

     Plaintiff,                                    Hon.

v.

TRAVIS WOODWARD, JARED WRIGHT,
MICHAEL KING, HERBERT VANRIPER,
SHEILA KOKKO,  and PENNY CHURCH in
their individual capacities, and SAGINAW
COUNTY

     Defendants.

_____

Stephen M. Lovell (P80921)
Ali W. Charara (P77682)
Charara Lovell & Associates, PLLC
28580 Orchard Lake Road, Suite 250
Farmington Hills, MI 48334
(248) 605-7657 /f (248) 605-7043
stephen@clawins.com
ali@clawins.com
janine@clawins.com

_____

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

     NOW COMES Plaintiff, Janet Bates, as the Personal Representative for the

Estate of Joshua Aldrich, by and through her attorneys Charara Lovell &

Associates, PLLC, and submits the following for her Complaint against

Defendants.

1

**INTRODUCTION**

1.     This is a civil rights action in which Plaintiff, Janet Bates, as Personal Representative for the Estate of Joshua Aldrich, seeks relief and all damages that flow from Defendants' multiple violations of decedent Joshua Aldrich's rights, privileges and immunities as secured by the Eighth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. §1983.

2.     Joshua Aldrich died on December 15, 2021 as a result of Defendants' deliberate indifference to Plaintiff's serious medical needs while he was incarcerated at Saginaw County Jail located in Saginaw, Michigan.

3.     During the period leading up to December 15, 2021, Defendants owed Joshua Aldrich a duty to protect him from the clear and known danger of an overdose, which Defendants deliberately ignored. Defendants' deliberate indifference to Plaintiff's serious medical needs proximately caused his death and the consequent damages to his Estate.

4.     On behalf of the Estate of Joshua Aldrich, as the Personal Representative thereof, Janet Bates seeks all relief appropriate and allowable resulting from the constitutional violations Defendants inflicted upon Joshua Aldrich.

5.     As part of the aforementioned relief, Plaintiff Janet Bates seeks damages for the Estate, including any and all damages recoverable under the Michigan

Wrongful Death Act, MCL 600.2922 and 42 USC Sections 1983 and 1988, attorney fees and costs, and any further relief the Court deems proper.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, and jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this District under 28 U.S.C. § 1391. The parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claims also occurred in this judicial district.

## PARTIES

8. Plaintiff Janet Bates is the duly appointed Personal Representative of the Estate of Joshua Aldrich. She is a resident of the County of Saginaw, State of Michigan.

9. Defendant Travis Woodward was a Saginaw County corrections officer and worked at Saginaw County Jail, which is located in the Eastern District of Michigan during all relevant times. He is sued in his individual capacity. At all times relevant in his capacity as a corrections officer, Defendant Woodward had a duty not to act with serious indifference to Mr. Aldrich's medical needs. He observed Mr. Aldrich's deteriorating condition at Saginaw County Jail both in person and on video and failed to provide Mr. Aldrich the proper medical care of which he was in desperate need.

10.     Defendant Jared Wright was a Saginaw County corrections officer and worked at Saginaw County Jail, which is located in the Eastern District of Michigan during all relevant times.  He is sued in his individual capacity.  At all times relevant in his capacity as a corrections officer, Defendant Wright had a duty not to act with serious indifference to Mr. Aldrich's medical needs.  He observed Mr. Aldrich's deteriorating condition at Saginaw County Jail and failed to provide Mr. Aldrich the proper medical care of which he was in desperate need.

11.     Defendant Michael King was a Saginaw County corrections officer and worked at Saginaw County Jail, which is located in the Eastern District of Michigan during all relevant times.  He is sued in his individual capacity.  At all times relevant in his capacity as a corrections officer, Defendant King had a duty not to act with serious indifference to Mr. Aldrich's medical needs.  He observed Mr. Aldrich's deteriorating condition at Saginaw County Jail and failed to provide Mr. Aldrich the proper medical care of which he was in desperate need.

12.     Defendant Herbert VanRiper was a Saginaw County sergeant and worked at Saginaw County Jail as shift commander, which is located in the Eastern District of Michigan during all relevant times.  He is sued in his individual capacity.  At all times relevant in his capacity as a sergeant and shift commander for Saginaw County Jail, Defendant VanRiper had a duty not to act with serious indifference to Mr. Aldrich's medical needs.  He observed Mr. Aldrich's deteriorating condition at

Saginaw County Jail and failed to provide Mr. Aldrich the proper medical care of which he was in desperate need.

13.    Defendant Sheila Kokko was a Saginaw County employee and worked as a medical professional at Saginaw County Jail, which is located in the Eastern District of Michigan during all relevant times.  She is sued in her individual capacity.  At all times relevant in her capacity as a registered nurse, Defendant Kokko had a duty not to act with serious indifference to Mr. Aldrich's medical needs.  She observed Mr. Aldrich's deteriorating condition at Saginaw County Jail and failed to provide Mr. Aldrich the proper medical care of which he was in desperate need and, instead, took a break while he lay unconscious on the floor of his cell.

14.    Defendant Penny Church was a Saginaw County employee and worked as a medical professional at Saginaw County Jail, which is located in the Eastern District of Michigan during all relevant times.  She is sued in her individual capacity.  At all times relevant in her capacity as a registered nurse, Defendant Church had a duty not to act with serious indifference to Mr. Aldrich's medical needs.  She observed Mr. Aldrich's deteriorating condition at Saginaw County Jail and failed to provide Mr. Aldrich the proper medical care of which he was in desperate need and, instead, took a break while he lay unconscious on the floor of his cell.

15.     Defendant Saginaw County was, at all times relevant hereto, a political subdivision of the State of Michigan.

16.     At all material times, Defendants acted under the color of state law, and pursuant to the policies, practices, customs, and usages of Saginaw County and/or the Saginaw County Sheriff's Department.

## FACTUAL ALLEGATIONS REGARDING
## THE DEATH OF JOSHUA ALDRICH

17.     Plaintiff, by reference, incorporates the preceding paragraphs as though fully set forth herein.

18.     Joshua Aldrich, the Decedent, was incarcerated at Saginaw County Jail at the time of his tragic death on December 15, 2021.  He was 26-years-old at the time of his death and had a son who was born just four days after his death.

19.     Late in the evening of December 13, 2021, Mr. Aldrich was arrested for an outstanding warrant due to a probation violation.

20.     He was taken to McLaren Bay Region Hospital in Bay County because he had swallowed a bag containing controlled substances.

21.     Mr. Aldrich was released from McLaren Bay Region Hospital at 6:30 a.m. on December 14, 2021 and transferred to the custody of Deputy Hill, who then transported Mr. Aldrich to the Saginaw County Jail.

22.     He was booked into Saginaw County jail at approximately 7:55 a.m. and placed in an intake cell.

23.    Mr. Aldrich spent the next several hours in his intake cell pushing the buzzer, banging on the door, and begging to speak with his mother

24.    During this time, Mr. Aldrich also appeared on video retrieving something from his pants that he then hiding it under the sink in his cell.

25.    Mr. Aldrich later retrieved what he had hidden under the sink and, at approximately 8:24 p.m., he was transferred to a padded cell in the medical wing by Defendants Woodward, Wright, King, and VanRiper.

26.    Defendant Woodward heard Mr. Aldrich state that he was hearing voices and was reluctant to move and Defendant VanRiper also heard Mr. Aldrich appear to be speaking to people who were not there.

27.    Defendant VanRiper stated that he believed Mr. Aldrich was going through detox and decided to move Mr. Aldrich for Mr. Aldrich's own safety.

28.    The padded cell in which Mr. Aldrich was places has live video monitoring as well as a call button that rings into master control.

29.    Defendant Woodward claims that Mr. Aldrich was being observed on video while he was in the padded cell.

30.    At approximately 8:52 p.m., Mr. Aldrich removed something from his pocket and ingested it.  An autopsy report after Mr. Aldrich's death would later confirm that he had ingested methamphetamines.

31.    At this point, Mr. Aldrich's behavior became increasingly erratic and alarming.

32.    Within ten minutes of ingesting the methamphetamines, Mr. Aldrich can be seen sweating, yelling, and trying to hide around the padded cell.

33.    From approximately 9:17 p.m. until 9:31 p.m., Mr. Aldrich repeatedly pressed the call button and banged on the cell door.

34.    Mr. Aldrich is then briefly observed by one of the Defendants through the cell's observation door and he appears to be talking to himself.

35.    Mr. Aldrich continued to press the call button for the next twenty minutes and well as screamed and jumped around his cell.

36.    Defendant VanRiper claimed that he was never made aware from master control or his officers that Mr. Aldrich had been hitting the call button.

37.    At approximately 10:03 p.m., Mr. Aldrich banged on the cell door and asked for water.

38.    Approximately ten minutes later, one of the Defendants observes Mr. Aldrich and he again asks for water and begins pounding on the cell door and asking for water.

39.    He then begins pacing in front of the door and continuously pressing the call button.

40.     Defendants saw this behavior through the observation window three separate times between approximately 10:31 p.m. and 10:43 p.m.

41.     Mr. Aldrich was clearly in distress but Defendants did nothing.

42.     From approximately 10:56 p.m. to 11:08 p.m., Mr. Aldrich was punching the observation window and food slot and begins heavily breathing.

43.     Mr. Aldrich then takes his shirt off and over the next several minutes continues to breathe heavily before bending over in front of the door and finally sitting on the ground.

44.     While Mr. Aldrich is on the ground, he was breathing very heavily and started pulling on the legs of his pants.

45.     At approximately 11:30 p.m., Mr. Aldrich gets up off of the floor and is still sweating and breathing heavily and begins talking to himself.

46.     At approximately 11:35 p.m., Mr. Aldrich tries to open the cell door before running into the back wall of his cell, falling to the ground, and assuming a defensive posture with his arm.

47.     Mr. Aldrich then runs back to the door to try and open it before running to the back of his cell, falling to the floor, and then punching the floor.

48.     At approximately 11:41 p.m., and after almost an hour of not being checked on by any of the Defendants, one of the nurse Defendants finally checks on Mr. Aldrich and asks if he is ok.

9

49.     In response, Mr. Aldrich ran to the door and began pounding on the window with his fist and the nurse Defendant leaves without rendering aid or assistance.

50.     At approximately 11:53 p.m., Mr. Aldrich began stumbling around his cell before falling by the door and then sitting himself up in the corner of his cell.

51.     At approximately 12:00 a.m. on December 15, 2021, Mr. Aldrich lies on the floor and is breathing heavily and talking to himself.

52.     At approximately 12:05 a.m., one of the Defendants observes Mr. Aldrich laying on the floor and moaning but does not render any aid or assistance.

53.     Mr. Aldrich then lies motionless on the floor until approximately 12:31 a.m. when one of the Defendants finally checks on him.

54.     The Defendant who checked on him then opens the observation window and knocks on the door but there is no response.

55.      The same Defendant then closes the observation door and flushes the floor vent but there is still not response.

56.     The same Defendant then reopens the observation door and began pounding on the door and telling Mr. Aldrich's name.  Mr. Aldrich still does not respond and continues to lie motionless on the floor.

57.     At approximately 12:36 a.m., Defendant Woodward opens the observation door and begins banging the food slot door up and down while yelling Mr. Aldrich's name.  Still there is no response from Mr. Aldrich.

58.    Defendant Woodward claims to have then asked Defendant Church Mr. Aldrich should be checked on and Defendant Church responded that they should not.

59.    At this point, Mr. Aldrich has been unresponsive on the floor of his cell for almost thirty minutes and still none of the Defendants offer any aid or assistance.

60.    At approximately 1:03 a.m., after another fifteen minutes had passed of Mr. Aldrich lying motionless on the floor, Defendant Wright went to the observation window and began yelling Mr. Aldrich's name, flushing the floor drain, and knocking and kicking on the door.  Again there is no response from Mr. Aldrich and Defendant Wright claimed that he did not see Mr. Aldrich move and that he believed Mr. Aldrich was not breathing.

61.    Defendant Wright then informed Defendant Woodward that he did not think Mr. Aldrich was breathing and advised him to contact Defendant VanRiper.

62.    At approximately 1:07 a.m., and after almost an hour of Mr. Aldrich lying motionless and unresponsive on the floor, Defendant Woodward finally enters the cell and slaps Mr. Aldrich's leg with no response.

63.    Defendants Woodward and VanRiper then tried to roll Mr. Aldrich over but it appeared that rigor mortis had set in, his hands and face were blue, and he was foaming at the mouth.

64.     Defendant Kokko then claims to have entered the cell and provided Narcan to Mr. Aldrich.

65.     Mr. Aldrich was still nonresponsive and an automated external defibrillator was applied and CPR was performed until paramedics arrived at approximately 1:22 a.m.

66.     Mr. Aldrich was pronounced dead on 1:46 a.m. on December 15, 2021.

67.     An autopsy revealed the Mr. Aldrich's cause of death was "acute intoxication by the combined effects of amphetamine and methamphetamine" and that the manner of death was "accident (intentional ingestion of drugs).

68.     The medical examiner also found a milky white substance in Mr. Aldrich's stomach and small intestine that was positive for methamphetamine.

69.     Defendants deliberately ignored, disregarded, and/or callously refrained from addressing or treating Mr. Aldrich's serious medical condition.

70.     Defendants observed Mr. Aldrich lying on his cell floor unmoving and unresponsive for almost an hour.

71.     Defendants had a constitutional duty to help, assist, and/or treat Mr. Aldrich's overdose and/or to refer him for hospitalization, as they had actual notice of Mr. Aldrich's dire medical condition.

72.     At all times relevant, Defendants completely failed to obtain the necessary help and/or treatment for Mr. Aldrich despite his obvious need for treatment.

73.     At all times relevant, Mr. Aldrich, the decedent, could have been and should have been provided with the treatment and his life could have been and should have been preserved by Defendants.

74.     Mr. Aldrich endured conscious pain and suffering before he ultimately succumbed to an accidental overdose and the effects thereof due to Defendants' deliberate indifference to his serious medical needs.

## COUNT I
## 42 U.S.C. §1983
## VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS

75.     Plaintiff, by reference, incorporates the preceding paragraphs as though fully set forth herein.

76.     Decedent was entitled to all rights, privileges and immunities accorded to all incarcerated citizens of the State of Michigan and the United States.

77.     At all times relevant, Defendants were acting within the course and scope of their employment with Saginaw County and/or Saginaw County Jail and/or Saginaw County Sheriff's Office and were acting under color of state law with the authority granted to them as corrections officers or correctional health care providers and/or managers and/or shift supervisors.

78.     Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Mr. Aldrich had a right to be free from cruel and unusual punishment

while incarcerated and under the custody and control of the Saginaw County at the Saginaw County Jail.

79.    At all relevant times, Mr. Aldrich had a right to adequate and sufficient medical care and/or treatment such that his life would be preserved and he at all times would be free from needless unjustified and preventable pain, suffering and deterioration of his health and well-being.

80.    At all times, Defendants, with malice, recklessness and/or deliberate indifference, kept Mr. Aldrich housed in an observation cell without adequate or proper medical care and ignored his distressing behavior.  Further, Defendants did not enter Mr. Aldrich's cell to check on him for almost an hour after he lay on the ground not moving and being unresponsive.  The aforementioned combined in whole or in part to cause, pain, suffering, deterioration of health, and ultimately the death of Mr. Aldrich.

81.    Mr. Aldrich's health and well-being began to deteriorate as a result of an accidental overdose.  The deterioration manifested in the form of erratic behavior, self-harm, paranoia, and finally lethargy, unconsciousness, and the inability to move or respond, all of which was apparent and/or obvious to the casual observer.

82.    Mr. Aldrich experienced a medical emergency, brought on by the accidental overdose.  The medical emergency manifested itself in the form of confusion, hallucinations, erratic, violent, and unusual behavior, and eventual

unconsciousness that left Mr. Aldrich lying on the floor of his cell unmoving and unresponsive for almost an hour before being checked on.

83.    During the time that Mr. Aldrich's health continued to deteriorate, the Defendants, pursuant to the Eighth and Fourteenth Amendment, were required to provide and/or obtain adequate medical care for the Plaintiff's obvious and serious medical condition.

84.    However, to the contrary, the Defendants acted with malice, recklessness and/or deliberate indifference when they failed to provide or obtain any care or treatment that was necessary to save Mr. Aldrich's life.

85.    The actions and/or omissions of the various Defendants constitute a deliberate indifference to the serious medical needs of Mr. Aldrich and demonstrated a reckless, willful and/or wanton disregard for the health and safety of Mr. Aldrich in violation of the Eighth and Fourteenth Amendments.

86.    As a direct and proximate result of the actions and/or omissions of the various Defendants, Mr. Aldrich suffered great physical pain, emotional distress, discomfort, loss of mental capacity, humiliation, degradation, and suffering.

87.    As a direct and proximate result of the actions and/or omissions of the various Defendants, Mr. Aldrich died of an accidental overdose.

88.    As a direct and proximate result of the acts and/or omissions of the various Defendants, the estate has sustained and is entitled to compensation for conscious

pain and suffering of the deceased during the period intervening between the time of the injury and death; funeral, and burial expenses and damages for the loss of financial support and the loss of the society and companionship of the deceased

89. Mr. Aldrich is survived by one or more of the following persons eligible to recover damages under the Wrongful Death Act: his mother and personal representative, his siblings, and his son.

90. By the aforementioned actions and/or omissions, Defendants have deprived Mr. Aldrich of the rights secured by the Eighth Amendment to the United States Constitution.

WHEREFORE Plaintiff respectfully requests compensatory non-economic and economic damages, including but not limited to all damages recoverable under the United States Constitution and/or 42 U.S.C. §1983 and/or the laws of the State of Michigan, including, but not limited to the Michigan Wrongful Death Act, punitive damages, reasonable attorney fees, costs and interest, and such other relief as appears reasonable and just under the circumstances.

## COUNT II
### *Monell* Claim
### (As to Defendant Saginaw County)

91. Plaintiff, by reference, incorporates the preceding paragraphs as though fully set forth herein.

92. Mr. Aldrich was subjected to a depravation of a clearly established, constitutionally protected right and privilege secured by the Eighth Amendment to the Constitution of the United States, which was his right to be free from cruel and unusual punishment.

93. The foregoing right was clearly established at the time of the violations.

94. The deprivations were caused by the customs, policies, and established practices of Defendant Saginaw County.

95. These unconstitutional practices, policies, and/or customs were a driving force behind the constitutional violation suffered by Plaintiff.

WHEREFORE Plaintiff respectfully requests compensatory non-economic and economic damages, including but not limited to all damages recoverable under the United States Constitution and/or 42 U.S.C. §1983 and/or the laws of the State of Michigan, including, but not limited to the Michigan Wrongful Death Act, punitive damages, reasonable attorney fees, costs and interest, and such other relief as appears reasonable and just under the circumstances.

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all issues allowed by law.

Respectfully Submitted,

/s/ Stephen M. Lovell
Stephen M. Lovell (P80921)
Charara Lovell & Associates, PLLC
Dated: February 10, 2023        Attorneys for Plaintiff

17